UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIDGETTE JEFFRIES, as Guardian for
MELVIN EASON, an incapacitated person,

    Plaintiff,

v.

UNITED STATES OF AMERICA, d/b/a
G.V. (SONNY) MONTGOMERY
VETERANS AFFAIRS MEDICAL
CENTER,

    Defendant.

No. C08-1514RSL

ORDER DENYING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on "Plaintiff's Motion for Partial Summary Judgment Under FRCP 56," Dkt. #9, and the "United States' Motion for Partial Summary Judgment," Dkt. #8. Plaintiff seeks summary judgment on the issue of defendant's liability for medical negligence, claiming that defendant's agents breached national standards of care in treating Melvin Eason's anticoagulation issues and thereby proximately caused his debilitating stroke. Defendant, meanwhile, seeks partial summary judgment limiting the damages plaintiff may seek to recover. The Court held oral argument on the motions on September 21, 2009. For the reasons set forth below, the Court denies both motions.

ORDER DENYING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

## II. DISCUSSION

**A. Background**

Melvin Eason, a Vietnam veteran, has an extensive history of medical problems, including several strokes associated with venous thromboembolic disease, a condition causing blood clots. Between 1978 and 2006, Mr. Eason received medical care from the G.V. (Sonny) Montgomery Department of Veterans Affairs Medical Center in Jackson, Mississippi ("Jackson VA"). The Jackson VA providers treated his thromboembolic disease with the anticoagulation (anti-clotting) medication Coumadin, which thins the blood to reduce the risk of clotting which can cause a stroke. From approximately 2000 to 2006, Mr. Eason's coagulation disorder was primarily managed by Dr. Alice Paysinger, a clinical pharmacist at the Jackson VA Coagulation Clinic.

Managing anticoagulation issues requires regular monitoring of a patient's International Normalized Ratio ("INR"), which is the standard unit for reporting the time it takes for blood to clot. An INR below a patient's target range is referred to as "subtherapeutic" and presents an increased risk of clotting, while an INR above the target range is referred to as "supratherapeutic" and presents an increased risk of bleeding. Mr. Eason's target therapeutic INR range was determined to be 2.0 to 3.0.

On November 15, 2006, Mr. Eason informed Dr. Paysinger that he was scheduled to undergo tooth extractions later that month. His INR on this date was 2.19. She advised him to hold his Coumadin for five days before the extractions and then resume Coumadin at higher doses than normally prescribed for three days following the extractions to ensure that the proper INR levels were maintained. In addition, he was to inject himself with Lovenox, an anticoagulant that acts quickly when a person is subtherapeutic, for three days prior to and three days after the extractions.

Mr. Eason returned to the clinic on December 12, 2006. His INR at that point measured 5.5 and, on re-test, 5.72. Dr. Paysinger instructed him to skip Coumadin for four days and then restart at a lower dosage and scheduled him to return to the clinic seven days later.

At his return visit on December 19, 2006, Mr. Eason's INR was 1.05, the lowest it had been in the years Dr. Paysinger had been treating him. The medical records for that visit indicate Dr. Paysinger's understanding that Mr. Eason would be out of town until January 10, 2007. She instructed him to take one tablet of Coumadin that day and half a tablet daily thereafter, and she scheduled him to return to the clinic on January 12, 2007.

Five days later, on December 24, 2006, Mr. Eason suffered a massive stroke. He was transported to Hardy Wilson Memorial Hospital, from where he was then transferred to the Jackson VA. Mr. Eason's INR at that time was 1.4. On January 23, 2007, Mr. Eason's family transferred him by airlift to the Seattle VA, where he stayed for six weeks before being discharged to the care of his daughter, Bridgette Jeffries.

The stroke left Mr. Eason in a near vegetative state. Ms. Jeffries, who is a trained registered nurse, has cared for her father at her home ever since his discharge, with the assistance of her grandmother, her children and her husband. The VA compensates Ms. Jeffries for two hours a day at $11.70 per hour for providing her father's bowel and bladder care. Mr. Eason also receives 20 hours of care per week from a certified nurse aide authorized and paid for by the VA.

On October 14, 2008, Ms. Jeffries, as guardian for Mr. Eason, filed a complaint for medical negligence against the United States pursuant to the Federal Torts Claims Act, 28 U.S.C. § 1346(b).

**B. Analysis**

Rule 56 provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden "to show initially the absence of a genuine issue concerning any material fact," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159 (1970)), and all evidence must be viewed in the light most favorable to the nonmoving party, <u>Hawkins v. United States</u>, 30 F.3d 1077, 1079 (9th Cir. 1994). Once the moving party makes the required showing, the burden shifts to the nonmoving party to come forward with sufficient evidence to demonstrate that there is a triable issue of fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986).

The issue of defendant's liability for medical negligence under the Federal Tort Claims Act is governed by state law. Because Mississippi is the state in which the alleged negligent acts took place, the substantive law of Mississippi controls any allegation of negligence. 28 U.S.C. § 1346(b)(1).

**1. Liability**

To establish a prima facie case of medical negligence under Mississippi law, a plaintiff must prove that (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result. <u>Burnham v. Tabb</u>, 508 So.2d 1072, 1074 (Miss. 1987). Mississippi adheres to a national standard of care in medical malpractice cases. <u>Maxwell v. Baptist Mem'l Hosp.-Desoto, Inc.</u>, 958 So.2d 284, 289 (2007).

**a. Violation of Standard of Care**

Plaintiff contends that defendant, through its agent Dr. Paysinger at the Jackson VA Coagulation Clinic, violated the applicable standard of care on December 19, 2006 "by failing to administer Lovenox in conjunction with the resumption of Mr. Eason's Coumadin given his 1.05 INR level on that date." Dkt. #9 at 13. Plaintiff further alleges that defendant violated the

standard of care on that date "by not warning Mr. Eason of his stroke risks if his INR was not rechecked within two or three days, and by scheduling his next appointment for January 12, 2006 without so advising him of those risks." Id. Defendant responds that "factual issues abound" regarding whether Dr. Paysinger violated the standard of care. Dkt. #21 at 5.

There is a strong argument that plaintiff has met her burden of proving that Dr. Paysinger violated the applicable standard of care by failing to administer Lovenox upon Mr. Eason's December 19, 2006 visit to the clinic. Given his unusually low INR of 1.05, see Paysinger Dep., Dkt. #11, Ex. 2 at 96, and his medical history of stroke and deep vein thrombosis, all of the proffered experts agree that Lovenox should have been the first line of defense against Mr. Eason's subtherapeutic INR level. Dr. Jennifer James, retained by plaintiff to opine on standard of care issues, stated that the "standard of care called for CP Paysinger to instruct [Mr. Eason] to maintain his previous stable dosing of Coumadin, to add Lovenox . . . to his Coumadin beginning that day to raise the INR level, and to have him return to the coagulation clinic daily or every other day for INR monitoring until he reached therapeutic INR levels." James Decl., Dkt. #12, Ex. A at 4. According to Dr. James, Dr. Paysinger's failure to do so was a "gross violation of [the] standard of care." Id. Upon deposition, Dr. James explained that while "[i]t takes several days for Coumadin to have bioavailability," Lovenox "acts quickly and is used as a bridging dose" when a patient on Coumadin is subtherapeutic. James Dep., Dkt. #11, Ex. 9 at 57. Dr. Josephine Hao, also retained by plaintiff to opine on standard of care issues, agreed that because Lovenox "results in an immediate anticoagulation effect," Mr. Eason should have been started on Lovenox therapy when his INR was 1.05. Hao Decl., Dkt. #13, Ex. B at 2. Dr. Hao further testified that the standard of care requires a doctor to bridge any moderate-risk patient with Lovenox when his INR is substantially below the target range, Hao Dep., Dkt. #11, Ex. 10 at 34; "Given tha[t] I consider [Mr. Eason] high risk, and to have an INR reading of 1.05, yes, something should have been given to him to protect him while we start the Coumadin," id. at 32.

Even defense expert Dr. Jeffrey Ward agreed that his first recommendation to Mr. Eason would have been to start on Lovenox and re-test his INR in two days. See Ward Dep., Dkt. #11, Ex. 3 at 64-65, 68-69.[1]

Dr. Ward did testify, however, that if Mr. Eason refused to return to the clinic within a week, it would be inappropriate to begin a Lovenox treatment because it would require frequent monitoring. See Ward Dep. at 65-66. Although Dr. Ward testified that he would "[p]robably" have started Mr. Eason on Lovenox, id. at 64, he concluded that Mr. Eason's Coumadin therapy was not "performed in a negligent way," Ward Decl., Ex. B at 8. "It is conceivable that [Mr. Eason's] stroke could have been prevented with aggressive use of Lovenox when he was shown to be sub-therapeutic, but the patients [sic] poor compliance with this therapy, and a cavalier attitude towards his anticoagulation . . . made that difficult if not impossible." Id. But Dr. Ward's report may be based on a scenario that never actually occurred. It is not entirely clear from the record whether Mr. Eason took his Lovenox as previously prescribed.[2] Dr. Ward's reference to Mr. Eason's "cavalier attitude" reflects his perception that Mr. Eason refused to return to the clinic within a week because of his travel plans. See Ward Dep. at 65-66. But nothing in Dr. Paysinger's medical records suggests that Mr. Eason dug his heals in to such an extent that a Lovenox treatment would have been impossible. The record reveals only Dr. Paysinger's understanding that Mr. Eason would be out of town until January 10, 2007. Dkt.

---

[1] Although Dr. Ward was retained by defendant to opine on standard of care issues, see Ward Decl., Dkt. #25 at 1, at his deposition he testitifed that he is "not familiar" with the standard of care for a pharmaceutical Ph.D. running a VA anticoagulation clinic in Mississippi, Ward Dep. at 61; see also id. at 62.

[2] At his deposition, Dr. Ward testified that Mr. Eason "[p]robably" took his Lovenox and "assume[d] . . . that Dr. Paysinger did not have a reason to think that he was noncompliant with the Lovenox when she made further decisions for his anticoagulation." Id. at 56.

#11, Ex. 5 at 2. There is no indication when Mr. Eason planned to leave town[3] or whether Dr. Paysinger even warned him that failure to take Lovenox and return to the clinic within a few days would create a risk of stroke.[4] Because the Court will be the trier of fact at the bench trial, it finds that these issues are better left for determination after it has heard from the proffered witnesses.

In addition, there remains a question as to whether Dr. Paysinger's failure to prescribe Lovenox was because of Mr. Eason's travel plans and his refusal to comply or whether she deliberately chose not to administer Lovenox because she did not believe Mr. Eason's condition warranted it. Dr. Paysinger "felt that it was more of a risk to give him the Lovenox at that time" given his previously supratherapeutic INR. Paysinger Dep. at 94. As Dr. Paysinger was concerned about the potential for bleeding, she did not prescribe Lovenox despite Mr. Eason's INR of 1.05.[5]

---

[3] In fact, Mr. Eason was still in town five days later when he had his stroke. While Dr. Paysinger stated in her declaration that she advised him to return to the clinic "within one week," Paysinger Decl., Dkt. #23 ¶3; see also id. ¶ 4, in her deposition she testified that she told him to come back "in a week," Paysinger Dep. at 96, 97. It does not appear that Dr. Paysinger further questioned Mr. Eason about precisely when he would be leaving town. See id. at 97 ("All I know is that when I asked him to come back in a week, he said he couldn't come back.").

[4] Although Dr. Paysinger stated that she warned Mr. Eason of the risks of not returning within a week to have his INR checked, she did not record that discussion in his chart. Paysinger Decl. ¶ 5. Dr. Alice Wen, plaintiff's expert, testified that the standard of care required Dr. Paysinger to document her instruction and the fact that Mr. Eason was not adhering to her medical advice. Wen Dep., Dkt. #29, Ex. 1 at 63, 65; see also Ward Dep. at 77 ("I agree that she should have warned him and it certainly would have been prudent to have documented it.").

[5] It appears that Dr. Paysinger's concern over Mr. Eason's December 12, 2006 INR of 5.72 took precedence over her concern for his December 19, 2006 INR of 1.05. Not only did she choose not to prescribe Lovenox, but also she reduced Mr. Eason's Coumadin dosage even though his most recent INR showed he was subtherapeutic. See Wen Dep. at 41 ("I can't think of any reason why a person would reduce the dose with an INR of 1.05."); Hao Decl., Ex. B at 2 ("The standard of care would require an increase in dosage in response to an INR of 1.05[.]").

ORDER DENYING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT -7-

To the extent defendant contends that Dr. Paysinger properly exercised her professional judgment given that Coumadin management is "as much an art as a science," Dkt. #21 at 6 (quoting Ward Decl., Ex. B at 8), the present analysis of the objective standard of care leaves no room for subjective assessments of Dr. Paysinger's intentions.

> The appropriate standard of care in a medical malpractice case is objective and centers around exercising the degree of care, diligence, and skill ordinarily possessed and exercised by a minimally competent and reasonably diligent, skillful, careful, and prudent physician in that field of practice. What the physician may have been thinking in "his best judgment" is irrelevant. What the physician did in treating the patient is the key factor. Patients expect their physician to always be exercising "their best judgment." However, it is clear that there are times where the physician's best judgment regarding treatment falls below the applicable standard of care.

Bickham v. Grant, 861 So.2d 299, 303 (Miss. 2003). The record strongly suggests that Lovenox was the best way to achieve immediate anticoagulation once Mr. Eason presented with a significantly low INR and that, in failing to prescribe Lovenox, Dr. Paysinger failed to abide by the applicable standard of care. However, in light of the lingering fact questions, the Court defers determination of the issue so that it may examine all of the evidence at the upcoming bench trial.

Moreover, whether Dr. Paysinger independently violated the standard of care by not advising Mr. Eason to return to the clinic sooner remains an issue of fact. Regardless of whether Dr. Paysinger warned Mr. Eason that he should return "within one week" or "in a week," see supra n.3, she testified that she did not think it was appropriate for him to return as early as Friday, December 22, 2006, see Paysinger Dep. at 97 ("I felt that . . . it would give us information that wouldn't be useful."). While the experts unanimously agree that a Lovenox treatment would have required the patient to return within a few days, it is not clear whether the standard of care required Mr. Eason to return before December 22, 2006 without a Lovenox prescription. See Hao Decl., Ex. B at 2 ("[A]rrangements should have been made at an alternative VA anticoagulation therapy center to monitor Mr. Eason and recheck his INR on or

around Friday, December 22, 2006."); Wen Dep. at 41 ("In Mr. Eason's case, minimally three days; maximally a week."); Ward Dep. at 70-71 ("Either Thursday or Friday, and that's if . . . I'm giving them Lovenox. If they aren't and I think I know what their appropriate Coumadin dose is then I may not bring them back that quickly.").

### b. Causation

Under Mississippi law, "[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." Burnham, 508 So.2d at 1074. Plaintiff's expert on causation unequivocally stated that "Mr. Eason's stroke and vegetative state were caused solely and directly by the failure of VA/Jackson to meet national standards of care to immediately and properly treat Mr. Eason's volatile and subtherapeutic INR levels." James Decl., Ex. A at 4; see also James Dep. at 71 ("Q: If Mr. Eason had been given Lovenox on 12/19/06, would he not have had a stroke? A: That's my belief.").

But while all of the experts agree that Mr. Eason's low INR could have caused his stroke, their opinions open the door to other potential causes as well. For instance, Dr. Marc Kirschner, retained by defendant to opine on causation issues, agreed in his deposition that "more likely than not, more probably than not, one of the causes of [Mr. Eason's] stroke was that he was subtherapeutic in his Coumadin therapy." Kirschner Dep., Dkt. #11, Ex. 7 at 13. But in his declaration, he points to other potential causes of the stroke, including Mr. Eason's history of atherosclerotic disease, hypertension and smoking, and his use of alcohol and barbiturates. Kirschner Decl., Dkt. #24, Ex. B at 7.[6] Dr. Ward also testified, "I think the proximate cause was

---

[6] The extent of alcohol present in Mr. Eason's system at the time of his stroke is itself an open question. Although Dr. Kirschner originally noted that Mr. Eason "had alcohol levels compatible with acute intoxication," Kirschner Decl., Ex. B at 7, he later clarified that "Mr. Eason's alcohol level on December 24, 2006 was not as high as I believed it was when I initially prepared my report, id. ¶ 4. Dr. Ward seemed to suggest in his deposition that the "alcohol issue" could be put "to rest." Ward Dep. at

ORDER DENYING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT        -9-

his low INR," Ward Dep. at 81, but acknowledged that "it may have been multifactorial" given Mr. Eason's history of vascular disease and age, id. Plaintiff's expert Dr. Cynthia Smyth testified that the "major cause" of Mr. Eason's stroke was the failure to administer Lovenox, Smyth Dep., Dkt. #22, Ex. H at 82, but upon further questioning, she acknowledged "that the cause could be described as multifactorial" in light of Mr. Eason's history of smoking, high cholesterol, hypertension, atherosclerotic disease, age and coagulation disorder, id. at 82-84.

In sum, while there is strong evidence indicating that defendant's violation of the standard of care was a significant factor leading to Mr. Eason's stroke,[7] viewing it in the light most favorable to defendant, there remains a genuine dispute regarding whether that violation was a proximate cause of the injury.

### 2. Damages

Defendant filed the present motion seeking to limit the damages plaintiff may recover as follows: (1) non-economic damages should be capped at $500,000; (2) past medical expenses are not recoverable given that they were paid for or reimbursed by the VA; (3) future medical expenses should be limited to out-of-pocket expenses for services not available from the VA; and (4) future medical expenses, to the extent any are not provided by the VA, should be further

---

47. Moreover, the effect of the positive barbiturate reading in Mr. Eason's system on his INR level remains unknown. Dr. Kirschner opined that "it is not unlikely that such medication combinations (alcohol and barbiturates) could result in a prothrombotic state, thus leading to the complications that ensued." Kirschner Decl., Ex. B at 7. But it is unclear how the later-revealed decreased alcohol level affects this analysis. Additionally, while Dr. Wen testified that "[b]arbiturates have documented interactions that can lower the INR," Wen Dep. at 54, Dr. Hao stated that "[b]arbiturates and alcohol would only increase the INR findings, if they had any impact at all," Hao Decl., Ex. B at 2.

[7] Indeed, at oral argument defendant conceded that plaintiff need only prove that the violation of the standard of care was *a* proximate cause. See Entrican v. Ming, 962 So.2d 28, 32 (Miss. 2007) (quoting Foster v. Bass, 575 So.2d 967, 992 (Miss. 1990)) ("[T]o be held liable, a person 'need not be the sole cause of an injury. It is sufficient that his negligence concurring with one or more efficient causes, other than the plaintiff's, is the proximate cause of the injury.'").

limited according to Mr. Eason's approximate life expectancy of five years. Additionally, defendant seeks to preclude Ms. Jeffries from asserting a loss of consortium claim.[8]

### a. Non-economic Damages

Defendant first asks that the Court limit the non-economic damages plaintiff may seek to $500,000. Dkt. #8 at 5. While there is no dispute that Mississippi law caps non-economic damages in medical malpractice cases filed after September 4, 2001 at $500,000, Miss. Code Ann. § 11-1-60(2)(a), plaintiff contends that the applicability of the cap is not yet ripe for adjudication, Dkt. #19 at 6. Mississippi law further provides that "[t]he trier of fact shall not be advised of the limitations imposed by this subsection (2) and the judge shall appropriately reduce any award of noneconomic damages that exceeds the applicable limitation." Miss. Code Ann. § 11-1-60(2)(c). Thus, while the statute requires the Court to limit an excessive award of non-economic damages to ensure compliance with the statutory cap, it does not limit the fact finder's consideration of any amounts above that cap. Cf. Bridges v. Enterprise Products Co., Inc., 2007 WL 571074 at *3 (S.D. Miss. Feb. 20, 2007). While the Court is aware of its obligation to cap non-economic damages at $500,000, it sees no need to foreclose argument at trial that the actual amount incurred exceeds $500,000.

Therefore, defendant's motion for partial summary judgment regarding the $500,000 cap on non-economic damages is denied.

### b. Past Medical Expenses

Defendant next contends that plaintiff cannot recover past medical expenses because they were provided by the VA. Dkt. #8 at 6. Defendant further maintains that plaintiff has not produced any evidence of medical expenses paid out-of-pocket and not reimbursed by the VA, so she should be precluded from seeking recovery of past medical expenses. Id. Plaintiff states

---

[8] Plaintiff indicated in her response that she does not intend to pursue a loss of consortium claim at trial, therefore this issue is moot.

that she "is not seeking any award for past medical expenses that have already been paid by the VA," but maintains that she has produced evidence of un-reimbursed, out-of-pocket expenses. Dkt. #19 at 8. Specifically, plaintiff states that the VA has not paid for the cost of a visit to the Providence Everett Medical Center emergency room, a special vest used to break up secretions in Mr. Eason's chest, and the services gratuitously provided by Mr. Eason's family members. Id. at 8-9.

The Court finds that an issue of fact remains as to whether plaintiff was reimbursed for the cost of the trip to the emergency room. Although plaintiff has not provided documentation of this out-of-pocket expense, Ms. Jeffries did testify that she knows she paid something toward the cost of the ambulance. Jeffries Dep., Dkt. #20, Ex. 1 at 91-92. While the actual amounts owed are not crystal clear at this time, it is obvious that the existence of past out-of-pocket expenses is an issue of material fact and therefore not appropriate for summary judgment.

Because neither plaintiff nor a collateral source such as Medicare has actually paid for Mr. Eason's vest, this expense does not qualify as a past medical expense. Rather, the vest falls under the category of future medical expenses.

The parties dispute whether the care gratuitously provided by Mr. Eason's daughter and other family members is compensable, although their analysis of the legal authority on the issue is minimal. Plaintiff cites <u>Clary v. Global Marine, Inc.</u>, 369 So.2d 507, 509 (Miss. 1979) for the "general principle of [the] collateral source rule that gratuitous care will not be deducted from recovery of damages." Dkt. #19 at 9. Defendant attacks <u>Clary</u> as "inapposite" given that it applied federal law, Dkt. #28 at 5, but provides no case law contradicting plaintiff's assertion that she should be compensated for her family's gratuitous care.

<u>Clary</u> does state "as a general rule" that "the fact that the plaintiff received gratuitous medical care, continued salary or wage payments, proceeds from insurance policies, or welfare or pension benefits, will not be taken into account when computing damages." 369 So.2d at 509

(citing 22 Am.Jur.2d Damages § 206 (1965)). Because Clary was an action in admiralty, the court considered federal law, but it did note that "Mississippi has a 'collateral source' rule under which compensation received by a plaintiff from a collateral source wholly independent of wrongdoer cannot be set up in mitigation or reduction of damages." Id. at 510 n.2 (citing Coker v. Five-Two Taxi Serv., 52 So.2d 356 (1951)). Clary, however, held only that "the plaintiff's recovery will not be reduced by the fact that the medical expenses were paid by some source collateral to the defendant," id. at 509; it did not specifically address or analyze gratuitous services provided by a family member. The Court's review of Mississippi case law, however, yielded several cases finding that an employer found liable in a workers' compensation claim is required to pay for the services provided by a family member. See Mississippi Transp. Comm'n v. Dewease, 691 So.2d 1007, 1012 (Miss. 1997) ("It is well-established that nursing care provided by a relative to an injured claimant is compensable as a medical benefit pursuant to Miss. Code Ann. § 71-3-15(1)[.]"); City of Kosciusko v. Graham, 419 So.2d 1005, 1009 (Miss. 1982); Babcock & Wilcox Co. v. Smith, 379 So.2d 538, 539 (Miss. 1980) ("[p]ractical nursing services over and above that called for by the ordinary duties of a wife in a normal home may be compensated as medical services under the Mississippi Workmen's Compensation Law.").

Moreover, the Court's review of analogous cases from other jurisdictions reveals that "a majority of the courts have held that the plaintiff is entitled to recover the reasonable value of such services, because a failure to account for the value of these services would provide the tortfeasor with an undeserved windfall." Stein on Personal Injury Damages § 7:11 (3d ed.).[9] If

---

[9] See Spiker v. John Day Co., 270 N.W.2d 300, 311 (Neb. 1978) ("The employer-insurer should not be allowed to profit from the gratuitous care, given out of love, to an injured employee by his spouse, when it was the employer which forced the care of the employee upon the spouse."); Klapac's Case, 242 N.E.2d 862, 864 (Mass. 1968) (existence of marital relationship did not bar wife from receiving payment for nursing services rendered to husband disabled from employment); Brinson v. Southeastern Utilities Serv. Co., 72 So.2d 37, 39 (Fla. 1954) (increasing damages award for wife's services to injured husband in view of evidence that he "required constant attention and aid"); Leglar v.

Mr. Eason's family were not attending to his daily needs by feeding him, bathing him, administering his medication, and performing countless other chores, see Jeffries Dep. at 44-62, hired professionals would have to do so, and there would be no dispute that defendant would be liable for those amounts. Defendant cannot disclaim responsibility merely because Mr. Eason is fortunate enough to have a family that is willing and able to take on the burden of his care.

Therefore, defendant's request that plaintiff be precluded from seeking recovery for past medical expenses is denied.

### c. Future Medical Expenses

Defendant next asserts that plaintiff should not be allowed to recover future medical expenses provided by the VA or that the VA could provide if requested to do so. While plaintiff cites the collateral source rule to claim that defendant should not be allowed to offset the VA benefits to which Mr. Eason is entitled against its liability for future medical expenses, defendant contends that the collateral source rule does not apply since the United States is the source of both the damages and the VA medical services.

---

Muscatine Clinic, 223 N.W. 405, 407 (Iowa 1929) (trial judge had "correctly permitted recovery for compensation for nurses, whether members of the family or not"); Houston & T.C.R. Co. v. Gerald, 128 S.W. 166, 170 (Tex App. 1910) ("If the wife had been indifferent to the suffering of her husband, and refused to nurse him, thereby compelling him to hire a stranger to nurse him, it would not be contended that he could not recover the reasonable wages that he had paid for such services. Is it against public policy to allow the same recovery for the same services rendered by a loving wife? We think not."); Beringer v. Dubuque S.R. Co., 91 N.W. 931, 933 (Iowa 1902) (jury allowed to consider value of nursing services supplied by adult daughter to her injured mother even though plaintiff did not actually pay or become obligated to pay for them); Howells v. North Am. Transp. & Trading Co., 64 P. 786, 787 (Wn. 1901) (husband can recover for his services in attending his wife the value of the services of a competent nurse). But see Goodhart v. Pennsylvania R. Co., 35 A. 191, 192 (Pa. 1896) ("The plaintiff cannot recover for the nursing and attendance of the members of his own household, unless they are hired servants. The care of his wife and minor children in ministering to his needs involves the performance of the ordinary offices of affection, which is their duty; but it involves no legal liability on his part, and therefore affords no basis for a claim against a defendant for expenses incurred.").

In Molzof v. United States, 502 U.S. 301 (1992), the government similarly argued that a damages award for future medical care would be duplicative of the free medical services already being provided by the veterans' hospital and therefore unlawfully punitive. The Supreme Court concluded that awarding future expenses in the light of free care was not punitive, id. at 312, and remanded the case for a determination on whether those amounts were recoverable under Wisconsin law, id.

On remand, the Seventh Circuit held that the plaintiff was entitled to an award for future medical expenses. Molzof v. United States, 6 F.3d 461, 468 (7th Cir. 1993).[10] The Seventh Circuit "share[d] the reluctance of other courts addressing this issue to deny the plaintiff the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor." Id; see Ulrich v. Veterans Administration Hosp., 853 F.2d 1078, 1084 (2d Cir. 1988) ("[A veteran] is not obligated to seek medical care from the party whose negligence created his need for such care simply because that party offers it without charge."); Feeley v. United States, 337 F.2d 924, 935 (3d Cir. 1964) ("To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice."). The Seventh Circuit held that "the Wisconsin Supreme Court would deem these benefits collateral," id. at 466, relying on two state cases that found that federally-funded health care is given in consideration of a veteran's service to his country, id. at 466-67. "Thus, under Wisconsin law, these benefits are analogous to traditional employee health benefits whereby an employee secures health benefits by contributing part of his salary to sustain the program. . . . Accordingly, we think it clear that Wisconsin law would treat these benefits as collateral to an award under the FTCA." Id. at 467.

---

[10] Defendant concedes, as it must, that it originally misstated the Supreme Court's holding in Molzof and ignored the fact that Seventh Circuit's original holding, 911 F.2d 18 (7th Cir. 1990), was overturned on remand in 1993.

While Mississippi does have a firmly established collateral source rule, see Coker v. Five-Two Taxi Serv., 52 So.2d 356 (1951), the Court has found no Mississippi law akin to the Wisconsin cases finding that a veteran's health care is given in consideration for his service. However, the Seventh Circuit's reasoning in Molzof is persuasive. The Seventh Circuit found that "the veteran has contributed to the medical benefits," Molzof, 6 F.3d at 468; "[i]n the case of veterans, the consideration is his service and, in all likelihood, a lower salary to sustain the program," id. at 467. Even though the United States is the ultimate provider of both health care and damages, the nature of the former is "as a payment from defendant as insurer to the plaintiff insured," while the nature of the latter is "as payment from defendant as tortfeasor to the plaintiff as the party injured by the defendant's negligence." Id. at 465 (quoting Karsten v. Kaiser Foundation Health Plan, Inc., 808 F.Supp. 1253, 1258 (E.D. Va. 1992)). It is not evident that plaintiff's health care options should be limited by the fact that his insurer and tortfeasor are one in the same.

On the other hand, Mississippi case law may indicate a policy preference against double recovery for the plaintiff. In Daves v. Reed, 222 So.2d 411, 416 (Miss. 1969), the Mississippi Supreme Court held that amounts paid by the defendant's insurance company to the plaintiff may be credited against the amount of damages which the plaintiff is entitled to recover from the defendant-insured. "The payments come not from a collateral source but from defendant. . . . Since the entire right is purchased by him, he gets no 'windfall' when he is allowed to credit medical payments against the medical portions of the general award." Id. The court also found that "the injured person should not be allowed a double recovery for his medical expenses already recovered in this way." Id.; see also Pearl Pub. School Dist. v. Groner, 784 So.2d 911, 916 (Miss. 2001) (applying Daves holding to claim filed under Mississippi Torts Claims Act). While the circumstances in Daves refer to past medical expenses, the court expressed concern for forcing a defendant to pay twice from two different funds. In the present case, if plaintiff

were to choose to continue receiving care from the VA, defendant would be paying twice for his medical care, albeit from different purses. The Court sees no indication from the Mississippi courts that Mississippi law would condone a situation allowing plaintiff double recovery for his medical benefits.[11]

The Court defers its decision on the issue of future medical expenses until after the upcoming bench trial, at which point it will grapple with this difficult question if it determines that defendant is liable and damages should be awarded.

### d. Life Expectancy

Finally, defendant asks the court to determine as a matter of law that Mr. Eason's life expectancy is at most five years. Defendant cites a single Idaho case for the proposition that "[w]here the determination of a plaintiff's life expectancy is outside the competence of an average layperson or juror, expert testimony is required." Dkt. #8 at 9 (citing Slack v. kelleher, 104 P.3d 958 (Idaho 2004)). Defendant has arrived at its five-year estimate through its designated expert Dr. Scott Kush, a medical researcher in the area of life expectancy, who based this opinion on Mr. Eason's medical history and a literature review on the subject. Defendant contends that plaintiff's failure to offer expert testimony regarding life expectancy into evidence precludes plaintiff from arguing otherwise. Plaintiff maintains that she intends to call Mr. Eason's treating physicians to testify regarding Mr. Eason's current medical status, his prognosis, the quality of care he is receiving, and how that care impacts his life expectancy. Dkt. #19 at 16. Plaintiff also relies on actuarial tables issued by the Office of the Washington State Insurance Commissioner.

---

[11] Cf. United States v. Hayashi, 282 F.2d 599, 603 (9th Cir. 1960) (injury-related benefits paid from unfunded general revenues are to be deducted in determining amount of award for pecuniary loss in FTCA action but similar benefits paid from a special fund source to which the plaintiff has contributed are not).

ORDER DENYING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT                -17-

The Court sees no reason to determine Mr. Eason's life expectancy as a matter of law. In Slack, the Idaho Supreme Court found that defendant was required to produce expert testimony that the plaintiff's medical condition would shorten her life expectancy, 104 P.3d at 965, even though the plaintiff herself did not offer any expert testimony on the issue, indicating that the defendant bore the burden of proof that the plaintiff would not live a normal life expectancy. Moreover, defendant has provided no basis for the Court to find that actuarial tables are irrelevant or inadmissible at trial. See Churchill v. Pearl River Basin Development Dist., 757 So.2d 940, 945 (Miss. 1999) (evidence of the plaintiff's life expectancy in the form of tables should be admitted).

Therefore, the Court denies defendant's request to preclude evidence and testimony regarding Mr. Eason's life expectancy at trial.

### III. CONCLUSION

For all of the foregoing reasons, the Court DENIES plaintiff's motion for partial summary judgment (Dkt. #9) and DENIES defendant's motion for partial summary judgment (Dkt. #8).

DATED this 28th day of September, 2009.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge