UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRIDGETTE JEFFRIES, as Guardian for MELVIN EASON, an incapacitated person,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, d/b/a G.V. (SONNY) MONTGOMERY VETERANS AFFAIRS MEDICAL CENTER,<br><br>Defendant. | No. C08-1514RSL<br><br>AMENDED MEMORANDUM OF DECISION |

This matter was heard by the Court in a bench trial commencing on October 5, 2009, and concluding on October 8, 2009. Plaintiff Bridgette Jeffries is the daughter and guardian of Melvin Eason, who suffered a debilitating stroke while under the care of the G.V. (Sonny) Montgomery Department of Veterans Affairs Medical Center in Jackson, Mississippi ("Jackson VA"). Plaintiff alleges that the Jackson VA violated the standard of care by failing to properly treat and monitor Mr. Eason's anticoagulation disorder in December 2006 and that this failure caused a catastrophic stroke on December 24, 2006. Plaintiff seeks past and future medical expenses as well as non-economic damages related to his pain, suffering, and loss of enjoyment of life. This Court has jurisdiction over this matter under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b).

## I. FACTUAL BACKGROUND

Melvin Eason was born in 1946. He is a United States Marine Corps veteran who suffers from an anticoagulation disorder that puts him at risk of forming blood clots. Although Mr. Eason has been treated with the anticoagulant Coumadin (also known as warfarin) for decades, he has suffered a number of strokes and clotting episodes. In addition, Mr. Eason had high cholesterol, hypertension, atherosclerotic disease, post traumatic stress disorder, and a history of smoking. From 2000 onwards, Mr. Eason's Coumadin dosage was primarily managed by Dr. Paysinger of the Anticoagulation Clinic at the Jackson VA. Mr. Eason's coagulation status was determined by measuring his International Ratio Level (INR), a standard reflecting the time it takes for blood to clot. Dr. Paysinger's treatment goal was to keep Mr. Eason's INR in a therapeutic range between 2.0 and 3.0.

In January 2004, Mr. Eason was scheduled for a colonoscopy and contacted the Anticoagulation Clinic for advice regarding his treatment regimen. Because anticoagulation medications increase the risk of bleeding, Mr. Eason was told to refrain from taking Coumadin from January 30th to February 4th, the day of the procedure. Coumadin takes approximately five days to leave the system after the patient stops taking it or, conversely, to reach therapeutic levels when restarted. To provide some anticoagulation protection immediately before and after the colonoscopy, Mr. Eason was taught how to inject enoxaparin, a fast-acting anticoagulant,[1] and instructed to use it on February 1st, 2nd, 5th, 6th, and 7th. Mr. Eason was instructed to take 7.5mg of Coumadin on the two days following the procedure before returning to his normal dose of 2.5mg (except for Mondays and Fridays, when he took 5.0mg). When he returned to the clinic as scheduled on February 24, 2004, his INR was within therapeutic range at 2.14. Dr. Paysinger noted that "[h]e followed the Coumadin and enoxaparin dosing

---

[1] Enoxaparin is a low-molecular-weight heparin product marketed as Lovenox.

AMENDED MEMORANDUM OF DECISION -2-

instructions he was given on 1/13 for the colonoscopy on 2/4." Plaintiff's Ex. 1 at USA001056.

On November 15, 2006, Mr. Eason told Dr. Paysinger that he was going to have "some teeth" extracted. Plaintiff's Ex. 1 at USA000955. He was told to hold the Coumadin for five days before the procedure, inject enoxaparin immediately before and after the extractions, and restart the Coumadin at a higher level for three days before returning to his maintenance dose. Plaintiff's Ex. 1 at USA000956. When Mr. Eason returned to the clinic on December 12, 2006, his INR was 5.55, rising to 5.72 a few hours later. Dr. Paysinger instructed him to refrain from taking Coumadin for four days and then return to his maintenance dose of 2.5mg.

One week later, on December 19, 2009, Mr. Eason's INR was 1.05, significantly below the therapeutic level. Dr. Paysinger's notes state:

> OBSERVATION/ASSESSMENT: Mr. Eason has not had any bleeding problems. He did not take Coumadin for 4 days starting on 12/12 when his INR was 5.55 and the repeat INR was 5.72 the same day. As noted above, he took 2.5mg on 12/17 and 12/18. He uses a weekly medication planner to assist with compliance. He eats 1 serving of greens or cabbage once a week. I reminded him that he needs to be consistent with this part of his diet. I also reminded him to notify me of any change in his medications, diet, or dietary supplements. I advised him to call the Coag Clinic if he has unusual bleeding and to go to the closest emergency room if he has a significant problem that needs to be evaluated. I gave him both verbal and written instructions today.

Plaintiff's Ex. 1 at USA000951. This note, with the exception of the second and third sentences, is virtually identical to the assessments recorded during each of Mr. Eason's previous four visits to the Anticoagulation Clinic. Plaintiff's Ex. 1 at USA000952, 955, 962-63, and 964. Mr. Eason was advised to take 5.0mg of Coumadin on December 19, 2009, and to take 2.5mg per day thereafter. He was to return to the clinic on "1/12/07 – will be out of town until 1/10/07." Plaintiff's Ex. 1 at USA000951.

Mr. Eason suffered a debilitating stroke on December 24, 2006, sometime before 2:00 pm, at the age of 60. He was transferred almost immediately to the Jackson VA. Although awake, Mr. Eason was generally unresponsive except to tactile stimuli on the right. Plaintiff's Ex. 1 at USA000946. His INR at 7:38 pm on December 24th was 1.4, below the therapeutic level. Mr. Eason's care was transferred to the Seattle VA and, in March 2007, he moved into his daughter's home near Seattle. Although Mr. Eason is minimally conscious, he is not able to take care of himself: he is restricted to a bed or wheel chair, must be fed through a tube in his digestive tract, cannot protect his airway, has limited gross motor skills, is catheterized, and requires significant assistance in all aspects of daily life. He is currently cared for by his daughter, who is a registered nurse, with the help of other family members including Mr. Eason's mother, granddaughters, son-in-law, and ex-wife. The VA pays Ms. Jeffries for two hours a day at the rate of $11.70 per hour for providing her father's bowel and bladder care. In addition, the VA provides supplies, equipment, and 20 hours per week of in-home assistance through Catholic Community Services.

## II. LIABILITY FOR MEDICAL MALPRACTICE

To establish a *prima facie* case of medical negligence under Mississippi law, a plaintiff must prove that (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result. Burnham v. Tabb, 508 So.2d 1072, 1074 (Miss. 1987). Mississippi adheres to a national standard of care in medical malpractice cases. Maxwell v. Baptist Mem'l Hosp.-Desoto, Inc., 958 So.2d 284, 289 (2007).

### A. Violation of Standard of Care

Plaintiff contends that the Jackson VA, through its agent Dr. Paysinger, violated the applicable standard of care on December 19, 2006, by failing to administer a fast-acting

anticoagulant in conjunction with the resumption of Mr. Eason's Coumadin. Plaintiff further alleges that defendant violated the standard of care by reducing Mr. Eason's maintenance dose of Coumadin without monitoring his INR to ensure that he reached therapeutic levels within a few days. Defendant argues that anticoagulation therapy is an inexact science and that Dr. Paysinger's treatment and monitoring decisions were reasonable in light of Mr. Eason's risk of bleeding, his elevated INR on December 12, 2006, and his unavailability before January 10, 2007.

Plaintiff has shown, by a preponderance of the evidence, that defendant violated the applicable standard of care by failing to administer a heparin product to provide fast-acting anticoagulation when Mr. Eason's INR was 1.05 on December 19, 2006. At that point, Mr. Eason had virtually no anticoagulant protection, had a long history of stroke and deep vein thrombosis, and had tested positive for a Lupus anticoagulation disorder.[2] Because it takes

---

[2] Dr. Paysinger testified that she did not know that Mr. Eason had tested positive for a Lupus anticoagulation disorder while she was treating him. Dr. Paysinger's individual knowledge is not dispositive, however. The defendant in this case is the Jackson VA, and it "knows" all of the information within the possession and control of its agents and employees. See, e.g., Glover ex rel. Glover v. Jackson State Univ., 968 So.2d 1267, 1276 (Miss. 2007). The question, then, is whether the records regarding Mr. Eason's positive Lupus anticoagulant test were in the Jackson VA's possession as of December 19, 2009.

In March 2003, Mr. Eason was hospitalized for abdominal pain at Oschner Medical Institute in New Orleans, Louisiana. He had an INR of 1.3 upon admission. During his stay, he was diagnosed and treated for deep vein thrombosis ("DVT") and tested positive for the Lupus anticoagulation disorder. Mr. Eason told both Dr. Paysinger and his primary care physician at the Jackson VA, Dr. Qureshi, that he had been hospitalized in New Orleans with a DVT. Plaintiff's Ex. 1 at USA001085-87. Dr. Qureshi requested that he obtain the medical records from that visit, which Mr. Eason apparently promised to do. Plaintiff's Ex. 1 at USA001087. Mr. Eason completed an authorization for release of the Oschner records on May 16, 2003 (Plaintiff's Ex. 1 at USA000095), and Thelma Eason, Mr. Eason's mother, remembers him taking the documents to the Jackson VA. The Oschner documents became part of Mr. Eason's medical records at the VA and were produced to plaintiff during this litigation. The Court finds, based on the relevant evidence, that the Jackson VA had in its possession the positive Lupus anticoagulation test results long before Dr. Paysinger was evaluating Mr. Eason's relative risks of bleeding and clotting on December 19, 2006. To the extent that the VA's record-keeping system was not capable of getting pertinent medical information to the clinicians who needed to see it, the system

several days for Coumadin to have bioavailability, all of the experts consulted in this litigation except Dr. Paysinger agree that a fast-acting anticoagulant should have been used to provide immediate anticoagulation in these circumstances.

        At trial, Dr. Paysinger testified that she reduced Mr. Eason's weekly dose of Coumadin and did not prescribe a heparin product because she was concerned about his risk of bleeding – in her professional judgment, Mr. Eason's risk of spontaneous bleeding was greater than his risk of clotting. This justification was developed during the course of litigation and is medically unsupported. Dr. Paysinger testified that her concern about bleeding arose from two things: (1) the fact that Mr. Eason had a gastrointestinal bleed that had been transfused (an apparent reference to treatment received at the Oschner Medical Institute in 2003), and (2) his high INR readings on December 12, 2009. The contemporaneous evidence does not support Dr. Paysinger's claim that she was concerned regarding Mr. Eason's risk of bleeding or that he was, in fact, more likely to bleed than any other individual on blood thinners. Dr. Paysinger's treatment notes prior to and including those generated on December 19, 2006, consistently report that "Mr. Eason has not had any bleeding problems." Even as late as May 2009, when Dr. Paysinger was deposed, she testified that Mr. Eason did not have a history of bleeding. There would have been no reason for Dr. Paysinger to be overly concerned about bleeding because she was unaware of his 2003 gastrointestinal workup: as discussed in footnote 2, Dr. Paysinger testified at both her deposition and the trial that she did not see the Oschner medical records during the time she was treating Mr. Eason. Thus, the only medical history Dr. Paysinger was aware of on December 19, 2006, showed that Mr. Eason was at risk of clotting when he was subtherapeutic. There was no reason to believe that his risk of bleeding outweighed the clear and obvious need to raise his INR to therapeutic levels.

---

directly contributed to the negligence that occurred in this case.

AMENDED MEMORANDUM OF DECISION        -6-

Nor can the elevated INR readings obtained on December 12, 2006, justify Dr. Paysinger's treatment decisions on December 19th. Dr. Paysinger apparently assumed that Mr. Eason had reached a new set point, such that his regular maintenance dose of 22.5mg of Coumadin a week had suddenly spiked his INR and needed to be readjusted. Dr. Paysinger therefore opted to reduce the weekly maintenance dose in order to avoid overcorrecting. Unfortunately, Dr. Paysinger failed to consider and properly investigate obvious alternatives to her set point theory. The medical record is silent regarding the date on which Mr. Eason had his teeth extracted, how many teeth were removed, whether and what he was able to eat following the procedure, any changes in his intake of greens, or whether he was prescribed antibiotics by his oral surgeon. At trial, Dr. Paysinger recollected specific questions and answers regarding Mr. Eason's diet and medications during the relevant time frame, but the Court does not find this testimony credible. Because taking antibiotics and/or decreasing dietary vitamin K would elevate a patient's INR, had these environmental conditions been properly investigated – *i.e.*, had Mr. Eason been asked a question more specific than "have there been any changes I should know about?" – the responses would have been recorded in her notes. Based on incomplete information, Dr. Paysinger decided to lower Mr. Eason's maintenance dose of Coumadin to 17.5mg per week at a point in time when he was basically anticoagulant-free. Even if this decision, as ill-informed as it was, fell within the standard of care, it in no way justifies Dr. Paysinger's separate decision to leave Mr. Eason without any anticoagulant protection for however long it would take the new Coumadin dosage to become therapeutic. Neither concerns about bleeding nor the December 12th INR values brings Dr. Paysinger's conduct within the standard of care.[3]

---

[3] Dr. Ward, one of defendant's experts, testified that it would have been inappropriate to begin a Lovenox treatment on December 19th because Mr. Eason refused to return to the clinic for monitoring within a week. Ward Dep. Tr. at 63. Dr. Paysinger apparently did not believe Mr. Eason's

Having reduced Mr. Eason's weekly dose of Coumadin and withheld fast-acting anticoagulation therapies, Dr. Paysinger should have monitored Mr. Eason's INR to ensure that he achieved therapeutic levels within a reasonable time frame. She did not. Mr. Eason was told to return to clinic in three weeks, on January 12, 2007. The clinic notes from December 19, 2006, read much the same as they had for Mr. Eason's previous visits to the Anticoagulation Clinic, except that the PLAN module states that Mr. Eason "will be out of town until 1/10/07." Dr. Paysinger testified that she asked Mr. Eason to return in one week (presumably on December 26, 2006), but that he said he "absolutely could not" come back at that time. She also testified that she told Mr. Eason he was at risk for both clotting and bleeding. There is no evidence that Dr. Paysinger warned Mr. Eason that he had virtually no anticoagulant protection and/or that the reduction in his maintenance dose might leave him subtherapeutic for weeks if not monitored. There is no evidence that Dr. Paysinger impressed upon him the importance of monitoring in this situation or asked him to come back before December 26, 2006.[4] There is no evidence that Dr. Paysinger attempted to confirm the extent of Mr. Eason's unavailability[5] or make arrangements to have his INR tested during his travels.[6]

---

unavailability prevented the use of a heparin product: Mr. Eason had twice been prescribed a combination of Coumadin and Lovenox with no follow-up monitoring.

[4] In fact, Dr. Paysinger did not want to see Mr. Eason before the holiday break. At her deposition, she stated that an appointment on Friday, December 22nd would not have been helpful since Mr. Eason's Coumadin levels may still have been in flux on that date. Paysinger Dep. Tr. at 97.

[5] Mr. Eason was not, in fact, scheduled to leave town for an extended period during the holiday season. Dr. Paysinger's note to the contrary is incorrect. Mr. Eason's family was scheduled to fly to Mississippi for a visit at the end of December. There is no evidence, other than Dr. Paysinger's note and testimony, that Mr. Eason was planning a trip, and he was at home on December 24th when he suffered his stroke.

[6] There is evidence that the Jackson VA had a policy against outside testing in part because it was unable to track in-coming results and disseminate them to the appropriate medical provider. Dr. Paysinger testified that one of the reasons she did not suggest or facilitate INR testing during Mr.

AMENDED MEMORANDUM OF DECISION         -8-

If Dr. Paysinger had properly advised her patient of his precarious situation and he had point-blank refused to come back to the clinic for monitoring, the discussion would have warranted more than a simple note memorializing Mr. Eason's travel plans. Under Dr. Paysinger's version of events, Mr. Eason was acting against medical advice, a situation that would have been – and should have been – recorded in her notes. All of the doctors involved in this litigation agree that Dr. Paysinger should have seen Mr. Eason within a week of December 19, 2006. Dr. Paysinger attempts to excuse her failure to meet this standard of care by showing that her patient was noncompliant, but her testimony regarding a flat refusal to return is incredible and the remaining evidence does not support a finding that Mr. Eason acted against medical advice.

For all of the foregoing reason, the Court finds that defendant was negligent when it failed to administer a heparin product to provide fast-acting anticoagulation on December 19, 2006, and failed to monitor Mr. Eason's INR within a week of that date.

## B. Causation

Under Mississippi law, "[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." Burnham, 508 So.2d at 1074. Based on the testimony of most of the experts in this case, the close temporal proximity between defendant's failure to provide fast-acting anticoagulation and Mr. Eason's stroke, and the fact that Mr. Eason was still not within therapeutic levels on December 24, 2006, the Court finds that defendant's failure to provide anticoagulant protection when restarting Coumadin on December 19, 2006, proximately caused plaintiff's damages. The Court acknowledges that other factors probably contributed to Mr. Eason's stroke and that it is even possible that there was no causal

---

Eason's travels was this policy. Thus, the Jackson VA's inability to handle medical records may have contributed to the failure to monitor described herein.

link. Based on the evidence presented in this case, however, it is more likely than not that defendant's conduct was a cause in fact of the stroke.

The Court cannot make the same finding with regards to defendant's failure to monitor Mr. Eason's INR after December 19, 2006. The standard of care required Dr. Paysinger to follow-up within a week which, given the intervening holiday, would have extended beyond the date on which Mr. Eason had his stroke. Thus, even if Dr. Paysinger had scheduled Mr. Eason to return to clinic on December 26, 2006, thereby providing the community standard of care, the stroke would not have been avoided.

### III. DAMAGES

Because of defendant's negligence, Mr. Eason needs round-the-clock care to stave off skin breakdown and aspiration, both of which carry a significant and deadly risk of infection. Most of his bodily functions require assistance from, and all of his daily needs must be provided by, others. Yet he is not comatose or in a persistent vegetative state: he is awake and at least minimally conscious, expressing joy at seeing family members, trepidation at the prospect of being hoisted in the lift, and playfulness when engaged. Bridgette Jeffries seeks past and future medical expenses,[7] as well as compensation for her father's pain, suffering, and loss of enjoyment of life.

### A. Past Medical Expenses

Mr. Eason is entitled to compensation for the unreimbursed medical care he has received since he came to live with his daughter. The fact that his family provided this care does not relieve defendant of its obligation to compensate Mr. Eason for medical services received. Miss. Transp. Comm'n v. Dewease, 691 So.2d 1007, 1012 (Miss. 1997); City of

---

[7] Plaintiff is not seeking an award for past medical expenses that were paid by defendant, such as the cost of Mr. Eason's tilt chair and expenses related to the aide provided through Catholic Community Services.

Kosciusko v. Graham, 419 So.2d 1005, 1009 (Miss. 1982); Babcock & Wilcox Co. v. Smith, 379 So.2d 538, 539 (Miss. 1980). As previously noted by the Court, if Mr. Eason's family were not attending to his daily needs, hired professionals would have had to do so, and there would be no dispute that defendant would be liable for those expenses.

Plaintiff seeks $ 4,710 per week to reimburse her family for the medical care and monitoring provided since Mr. Eason moved into her home in March 2007. That number is based on a 168-hour week. The Court finds that Mr. Eason's care can generally be handled by a single care giver, but that for two hours per day, a second person is needed for personal care and/or transportation. Thus, Mr. Eason requires 182 hours of care per week. In the past, defendant has provided 20 hours of assistance through Catholic Community Services, and should therefore be given credit for those hours. An award of $ 609,164 ($ 4,546 per week for 134 weeks) reasonably compensates plaintiff for past unpaid medical expenses.

**B. Future Medical Expenses**

It is undisputed that Mr. Eason will require medical care and monitoring for the rest of his life. The three primary issues related to the amount of future medical expenses are: (1) Mr. Eason's life expectancy; (2) whether defendant should be credited for any expenses it would provide to Mr. Eason as a veteran; and (3) the qualifications of the provider(s) who will care for Mr. Eason on a regular basis.

**(1) Life Expectancy**

Having reviewed all of the evidence, the Court finds that Mr. Eason will, on a more probable than not basis, live for another ten years. His medical condition is such that he faces numerous perils and hazards that would not faze the vast majority of 62 year old men in the United States, including many who have disabilities. Thus, the standard life expectancy table for the United States significantly overstates Mr. Eason's projected lifespan. On the other hand, Mr. Eason is not in a persistent vegetative state and is receiving exceptionally attentive

and high quality care from his family. This care has allowed him to avoid conditions and injuries that can be fatal to persons in his situation, such as bedsores, pneumonia, and systemic infections. Based on the evidence, the best estimate of life expectancy is ten years from the date of this Order.

**(2) Services from the Veterans Affairs Administration**

As a veteran of our armed services, Mr. Eason has the option of seeking medical care and services through the Veterans Affairs Administration. He is not required to do so, however, and may choose to seek the services of private healthcare professionals. The Court will not deny Mr. Eason "the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor." Molzof v. United States, 6 F.3d 461, 468 (7th Cir. 1993). See also Ulrich v. Veterans Admin. Hosp., 853 F.2d 1078, 1084 (2d Cir. 1988).[8]

**(3) Level of Services**

Mr. Eason is entitled to an amount that will fairly compensate him for the reasonable and necessary medical expenses he will incur in the future. See Miss. Model Jury Instr. § 11:5. The parties disagree regarding the appropriate level of care defendant should be required to provide.

Although round-the-clock care from a registered nurse would provide maximum protection, it is not necessary. Mr. Eason needs assistance with all aspects of daily life and must be monitored to make sure he does not aspirate. Although he occasionally needs services that only a registered nurse or doctor can provide (such as when his PEG tube popped out and needed to be reinserted), those events are rare and sporadic. Having a registered nurse in the house waiting for such needs to arise would be unreasonable, especially in light of the fact that Bridgette Jeffries is, in fact, a registered nurse who will undoubtedly remain involved in the

---

[8] This issue has not yet been decided under Mississippi law. See Order Denying Motions for Partial Summary Judgment (Dkt. # 47) at 14-17.

AMENDED MEMORANDUM OF DECISION -12-

care of her father. In addition, Mr. Eason does not currently receive, and does not appear to need, twenty-four hour alert care. Paying a registered nurse to personally attend Mr. Eason at all times is unreasonable and unnecessary when there are more cost-effective and medically acceptable options available.

Having reviewed the evidence in the record, the Court finds that a certified nurse aide under the remote direction of a registered nurse can provide adequate care when the family is at home. The level of care must increase whenever plaintiff takes vacation or is otherwise away from home for an extended period. In addition, Mr. Eason is entitled to 182 hours of care per week so that there are two care givers available for two hours every day to handle bathing, transportation, and other activities that cannot be performed safely by a single individual.

**(4) Itemization of Economic Costs for Next Ten Years**

| | |
|---|---|
| Diagnostic, Treatment, and Supply Costs | $ 499,057 [9] |
| In-Home Care Costs | |
|     Nurse Delegated Caregiver | $ 1,868,160 [10] |
|     Certified Nurses Aide | $ 145,600 [11] |

---

[9] The items and costs that contribute to this total are based on the report of Anthony J. Choppa, dated September 25, 2009. The total does not include increased costs related to initial evaluations, costs for grab bars, or the costs of a second electric lift and electric bed. If no "per session" cost were provided, the item is not included. Items with replacement rates of "PRN" are not included. Mr. Eason's family has not asserted direct claims in this litigation and cannot, therefore, recover costs associated with family psychological counseling. The total includes $60,000 to modify the Jeffries' new home to accommodate Mr. Eason and his equipment: no additional housing modification costs are awarded.

[10] This amount is based on the cost estimate provided in the report of Kathryn Reid, dated May 5, 2009. Because nursing care will be provided when Bridgette Jeffries and her family are away from home, nurse delegated care is awarded for 48 weeks per year.

[11] This amount is based on the cost estimate provided in Mr. Choppa's report.

AMENDED MEMORANDUM OF DECISION -13-

|  |  |
|---|---|
| Registered Nurse | $ 341,000 [12] |
| Advisers |  |
|    Case Management Specialist | $ 32,400 |
|    Guardianship/Financial Services | $ 13,800 |
| Total | $ 2,900,017 |

Based on the "Stipulated Agreement on Discount Future Medical Expenses" submitted by the parties (Dkt. # 65), the Court finds that the present value of this award is $ 2,699,728.

### D. Non-Economic Damages

The stroke Mr. Eason suffered on December 24, 2006, damaged his brain to such an extent that it is difficult to evaluate his perception of himself and his current situation. There is no doubt, however, that he reacts to painful stimuli and that, although limited by profound physical disabilities, he makes efforts to interact with his family to convey his likes and dislikes. Having reviewed all of the evidence, including the "Day in the Life" video created by plaintiff, the Court finds that Mr. Eason's non-economic damages are $1,000,000. Pursuant to Miss. Code Ann. § 11-1-60(2)(a), plaintiff is hereby awarded $500,000 for his pain, suffering, and loss of enjoyment of life.

### IV. CONCLUSION

For all of the foregoing reasons, the Court finds that plaintiff is entitled to an award of $ 609,164 in past expenses, $ 500,000 in non-economic damages, and $ 2,699,728 in future medical expenses. The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendant in the amount of $ 3,808,892.

---

[12] This amount includes time spent caring for Mr. Eason while his family is away (four weeks per year at $50 per hour) and time training two caregivers ($250 per worker each year).

Dated this 28th day of October, 2009.

                       /s/ Robert S. Lasnik
                       Robert S. Lasnik
                       United States District Judge